**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

KATHLEEN WALKER,

     Plaintiff,

        v.

MICHAEL HELLER, et al.,

     Defendants.

Civil No. 15-580 (RMB/KMW)

**OPINION**

APPEARANCES:

THE O'HANLON LAW FIRM
By:  Stephen T. O'Hanlon, Esq.
2 Penn Center Plaza, Suite 1850
1500 John F. Kennedy Blvd
Philadelphia, Pennsylvania 19102
    *Attorneys for Plaintiff*

MAYFIELD TURNER O'MARA & DONNELLY, P.C.
By:  Francis X. Donnelly, Esq.
     Robert J. Gillispie, Jr., Esq.
2201 Route 38, Suite 300
Cherry Hill, New Jersey 08002
    *Attorneys for Defendants*

**BUMB**, UNITED STATES DISTRICT JUDGE:

In this § 1983 suit, Plaintiff Kathleen Walker asserts that Defendant Winslow Township police officers violated her federal constitutional rights when they responded to a domestic dispute

call to Walker's home, and subsequently arrested Walker on a disorderly persons charge.[1]

Defendants move for summary judgment.[2]  For the reasons stated herein, the motion will be granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In the evening of July 28, 2014, Defendant Winslow Township Police Officers Heller, Saunders, and Mueller responded to Plaintiff Walker's home, dispatched on a domestic dispute call. (Gillispie Cert. Ex. A)  It is undisputed that Walker lived in the house with her long-term boyfriend, Dante Wilson, their two young children (aged 10 and 5 years old at the time), and Wilson's daughter, Chante Hitchens, who was approximately 20 years old at the time.  (Gillispie Cert. Ex. A; Defendants' Statement of Undisputed Facts, "DSUF", ¶ 2; Walker Dep. p. 6-7, 14-15, 34, 52, 71)

---

[1]    The Court exercises federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

[2] The Complaint also asserts municipal liability claims against Winslow Township.  However, in response to Winslow Township's Motion for Summary Judgment, Plaintiff states she "agrees that Defendant Winslow Township can be released from the present action." (Opposition Brief, Dkt. No. 42, p. 2) Accordingly, all claims against Winslow Township will be dismissed with prejudice pursuant to Fed. R. Civ. P. 41(a)(2).

Hitchens was the person who called the police (DSUF ¶ 8), asserting that Plaintiff Walker was denying her access to the home. (Gillispie Cert. Ex. A; Hitchens Dep. p. 13-15, 33) Wilson, who serves in the New Jersey National Guard, was away on a two-week training exercise. (Wilson Dep. p. 48; Walker Dep. p. 33)

When the officers arrived at the house, Hitchens was standing by her car in the driveway. (Gillispie Cert. Ex. A; Hitchens Dep. p. 16) The officers first spoke with Hitchens, who explained that she wanted to get into the house to get her belongings. (Hitchens Dep. p. 16-17) She also told the officers that she had received "harassing" and "threatening text messages" from Plaintiff, and that different police officers had been called to the house the day before because Plaintiff was not allowing Hitchens into the house. (Saunders Dep. p. 10-11)[3]

Defendant Saunders testified that he determined that Hitchens lived at the house by looking at her driver's license (which listed the address of the house as her address), and that

---

[3] See also Master Incident Report, Gillispie Cert. Ex. A, "Hitchens advised that Walker had been texting her through out [sic] the day on 7/28/2014. Hitchens advised that she felt harassed by these text messages. In one of the messages Walker advised that she was going to make Hitchens life [sic] a living hell if she was to return to the residence."

Plaintiff admits that she exchanged text messages with Hitchens, but she did not testify about the messages' content. (Walker Dep. p. 66-67)

the officers were "invited onto the property" by Hitchens.
(Saunders Dep. p. 17, 13)  Officers Saunders and Heller then
went to the front door of the house.

Officer Mueller testified that while Saunders and Heller
were knocking on the front door, he "decided to walk around back
to see if I could see into the house and see if we could have
contact." (Mueller Dep. p. 7)  He further testified that he had
"no permission to go on the property," but he walked from the
front yard, through the side yard and into the backyard of the
property in an "attempt to make contact with the other party in
a domestic dispute." (Id., p. 7-9)  Mueller further testified,

> [w]hen we arrived and we were told of the incident
> between mother and daughter, we needed to speak to
> the mother.
>
> So we went to the house to make contact with
> the mom, make sure she was okay, there wasn't some
> kind of incident where she was injured or hurt.
>
> . . .
>
> Due to the situation being heated, the way
> Hitchens was upset about things, we just had to speak
> to both parties and make sure everything was okay.

(Mueller Dep. p. 6-7)  Officer Saunders' report similarly
stated, "Ptlm. Muller [sic] walked around back and attempted to
make contact at the back door with negative results."
(Gillispie Cert. Ex. A)

Plaintiff Walker testified that she was upstairs in the
house bathing her daughter when she heard "pounding," or

"banging" on the front door. (Walker Dep. p. 56, 71) She answered the door, and Officer Saunders "asked" if he and Officer Heller could "come in[to the house] and talk." (Id., p. 56) Walker undisputedly said yes, and allowed Officers Saunders and Heller into the foyer of the house. (DSUF ¶¶ 11-12) Officer Saunders' Master Incident Report states that "Walker answered the door and invited all three (3) officers inside the residence." (Gillispie Cert. Ex. A; see also Saunders Dep. p. 46) Plaintiff Walker disputes that she invited the third officer, Officer Mueller, into the house. (See Hitchens Dep. p. 18; Walker Dep. p. 56)

Nonetheless, Walker testified that "about a minute after [Officers Saunders and Heller] entered my house and shut the door, about a minute later Officer Mueller entered. So at that time all three officers were standing right in the foyer area." (Walker Dep. p. 57)

Walker further testified,

> [t]he only officer that spoke to me at all was
> Officer Saunders. I [told him] . . . Chante
> [Hitchens] made an agreement . . . that she wasn't
> going to return [to the house] until her father got
> home. . . . And [Saunders] said I don't care. She
> changed her mind. She has that right. This is her
> residence. . . . And he said . . . she can come in
> and out of here whenever she wants and . . . there's
> nothing you can do about it. And I said okay.

(Walker Dep. p. 56-57)

All parties agree that the situation escalated quickly.[4] According to Officer Mueller, "[o]nce we [spoke] to [Walker], we don't get a word in edgewise. . . . [A]sking questions and no response and we're not getting anywhere with our conversation and she's continuing to get louder and point and get closer." (Mueller Dep. p. 15-16)

Officer Saunders similarly testified, "[w]e tried to talk to Ms. Walker but she was being aggressive towards us, belligerent, yelling, invading my personal space, pointing her finger, waving her arms." (Saunders Dep. p. 24)

Hitchens also testified that, from where she was standing outside of the house, she could hear Walker "yelling and screaming." (Hitchens Dep. p. 18)

Walker testified that after Officer Saunders told her that she "didn't have any right to forbid [Hitchens] from coming in," she "said, then get the hell out of my house because he kept saying I don't care. I said get the hell out of my house." (Walker Dep. p. 57)

When asked at her deposition whether she "raised her voice" at this time, Walker testified, "I might talk loud and somebody might interpret that in a different way. I did not believe I

---

[4] Walker testified that the entire incident in the foyer "didn't last more than two minutes." (Walker Dep. p. 71-72)

was raising my voice but [the officers] may have." (Id. p. 62)[5]
Walker unequivocally testified, however, that she did not point
in the officers' direction, nor walk towards them, nor invade
their personal space. (Id. p. 63-64)

According to Walker,

> [f]inally I said, get the hell out of my house. And
> when I said get out of my house . . . Officer Mueller
> charged me and pushed me up against the wall and then
> turned me around and put handcuffs on me. And I said
> what are you doing. He told me to shut up. He told
> me he was going to take me . . . to jail. . . . And
> I said you can't take me to jail. I didn't do
> anything. He said, I'm sick of your mouth. I'm
> going to teach you a lesson. Then he took me out
> [of the house].

(Walker Dep. p. 72-73) Walker also testified that she "was
moving her hand away" as Mueller was attempting to handcuff her.
(Id. p. 57) She explained, "I pulled my arms -- he caught me
off guard. I was like what are you doing." (Id. p. 75)

Mueller testified,

> she's continuing to get louder and point and get
> closer, [I made the] determination [] she should be
> put under arrest. . . . I stepped toward Ms. Walker
> and with my left hand reached out to grab around to
> her left hand which she turned away. . . . She pulled
> away again, as she continued her turn. As I had
> control of her left arm, Officer Saunders stepped up
> and we were able to control her.

(Mueller Dep. p. 16)

---

[5] Dante Wilson testified at his deposition, "Q: Did
[Walker] tell you she was courteous with the officers? A: Oh,
no. She said she yelled at the officers to get out." (Wilson
Dep. p. 52)

Saunders' report states that "Ptlm. Muller [sic] placed her hands behind her back. Walker did attempt to pull away, however, I was able to place handcuffs on her without incident." (Gillispie Cert. Ex. A)

It is undisputed that after Walker was placed in handcuffs, she was escorted outside the house and into the back of a patrol car. (DSUF ¶ 17) Hitchens testified that Walker's "children were looking out the window and they were crying" as Walker was being put into the police car. (Hitchens Dep. p. 20-21)

At this time Hitchens was speaking to her father, Dante Wilson, on her cell phone. Wilson testified that he asked to speak to "an officer" who told Wilson that Walker was being arrested "to teach her a lesson." (Wilson Dep. p. 51)[6] Wilson and Hitchens agreed that Hitchens would stay with the children while Walker was taken to the station for processing. (Wilson Dep. p. 51; Hitchens Dep. p. 21-22)

Then, the officers received another call for a burglary in progress and Saunders' lieutenant directed Saunders "to just issue [Walker a] Special Complaint and process her at the scene," rather than take her to the station. (Saunders Dep. p. 34; Mueller Dep. p. 24-25) The Special Complaint charged Walker with disorderly conduct in violation of N.J.S.A. 2C:3-2A(1). It

---

[6] Officer Saunders testified that he was the officer that spoke to Wilson on the phone. (Saunders Dep. p. 44)

is undisputed that the charge was dismissed at a municipal court hearing in August, 2014. (Walker Dep. p. 85-86)

Later in the night of July 28th and the following day, Walker observed "redness" and later "bruises" on her arms, which she contends were caused by the handcuffs that were placed on her. (Walker Dep. 19-22) She took pictures of the marks on her arms with her cell phone. (DSUF ¶¶ 21-26) It is undisputed that the red marks and bruising "resolved within five days" without any medical treatment. (DSUF ¶ 20, 27) Walker testified that she sustained no other bodily injuries as a result of her arrest. (Walker Dep. p. 29) Walker also testified that she sustained emotional injuries in the form of "humiliation" and "fear of the police." (Id.) Walker has never sought any treatment for any of her injuries, has been able to "fully go about her activities of daily living," and did not miss any time from work as a result of her injuries. (DSUF ¶¶ 30-33)

The Complaint asserts four counts, all pursuant to § 1983: (1) false arrest in violation of the Fourth Amendment; (2) excessive force in violation of the Fourth Amendment; (3) malicious prosecution in violation of the Fourth Amendment; and (4) "Fourth Amendment trespass."

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  Id.

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party."  Meyer v. Riegel Prods. Corps., 720 F.2d 303, 307 n. 2 (3d Cir. 1983).  However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252. Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 372, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party[.]"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (citing Fed. R. Civ. P. 56(e)). In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")).

## III. ANALYSIS

All three officers move for summary judgment asserting that they are entitled to qualified immunity. "[Q]ualified immunity protects government officials from liability for civil damages

insofar as their conduct does not violate clearly established .
. . . constitutional rights of which a reasonable person would
have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)
(internal citation and quotation omitted).  The qualified
immunity analysis first considers whether there was a
constitutional violation and, if so, whether the right violated
was clearly established at the time of the misconduct.  <u>Id.</u> at
232.  "A right is clearly established only if its contours are
sufficiently clear that 'a reasonable official would understand
that what he is doing violates that right.'"  <u>Carroll v. Carman</u>,
135 S.Ct. 348, 350 (2014)(quoting <u>Andersen v. Creighton</u>, 483
U.S. 635, 640 (1987)).

**A. <u>False arrest</u>**

The Fourth Amendment prohibits arrests without probable
cause.  <u>Berg v. Cty. of Allegheny</u>, 219 F.3d 261, 269 (3d Cir.
2000).  Walker argues that Defendants lacked probable cause to
believe that she committed the offense of disorderly conduct
because her conduct took place behind a closed door in the foyer
of her own home, and disorderly conduct, under New Jersey law,
requires that a person act "with purpose to cause <u>public</u>
inconvenience, annoyance or alarm."  N.J.S.A. § 2C:33-2(a)
(emphasis added).

Defendants appear to concede this point but argue, however,
that even if they lacked probable cause to believe Walker

engaged in disorderly conduct, they are nonetheless entitled to
summary judgment because "[i]n analyzing false arrest claims, a
court, in order to insulate a defendant from liability, need
find only that '[p]robable cause . . . exist[ed] as to any
offense that could be charged under the circumstances.'" (Reply
Br., Dkt. No. 44, p. 3)(quoting <u>Johnson v. Knorr</u>, 477 F.3d 75,
84-85 (3d Cir. 2007)).[7]  According to Defendants, the undisputed
record demonstrates that they had probable cause to believe that
Plaintiff obstructed justice in violation of N.J.S.A. 2C:29-
1(b).[8]

---

[7] <u>See</u> <u>also</u>, <u>Devenpeck v. Alford</u>, 543 U.S. 146 (2004)(holding
that "an arrest is lawful under the Fourth Amendment [even] when
the criminal offense for which there is probable cause to arrest
is not 'closely related' to the offense stated by the arresting
officer at the time of arrest.").

[8] Defendants also argue that "even if an individual's
actions do not rise to the level of prohibited conduct under
N.J.S.A. 2C:33-2 (disorderly conduct), they could still be
considered a breach of the peace" in violation of N.J.S.A.
40A:14-152. (Reply Br., Dkt. No. 44, p. 5)  It does not appear,
however, that 40A:14-152 creates an independent substantive
criminal offense under the New Jersey Criminal Code.  The
statute provides, "officers of a police department . . . within
the territorial limits of the municipality, shall have all the
powers of peace officers and upon view may apprehend and arrest
any disorderly person or any person committing a breach of the
peace."  New Jersey courts have treated 40A:14-152 as a
jurisdictional statute. <u>See</u>, <u>e.g.</u>, <u>State v. Dangerfield</u>, 171
N.J. 446, 460 (2002)("In this case, N.J.S.A. 40A:14-152
authorizes municipal police officers to arrest any 'disorderly
person' who commits such an offense in the presence of the
arresting officer."); <u>State v. Montalvo</u>, 280 N.J. Super. 377,
381 (App. Div. 1995)("N.J.S.A. 40A:14-152 provides 'the powers'
of police officers within the municipality which employs them.
But it is clear that the Legislature contemplated that police

The statute provides, in relevant part, "[a] person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act." N.J.S.A. 2C:29-1.

This Court has previously held that, to support an obstruction of justice charge, "defendant must have affirmatively done something to physically interfere or place an obstacle to prevent the police from performing an official function." Batiz v. Detullio, No. CV 12-581 (RMB/AMD), 2016 WL 299198, at *2 (D.N.J. Jan. 25, 2016)(citing State v. Camillo, 382 N.J. Super. 113, 121-22 (App. Div. 2005); State v. Berlow, 284 N.J. Super. 356, 360 (App. Div. 1995)).[9] The physical act may include "failure to follow instructions of an officer," or "fail[ing] to engage in some physical conduct that causes interference;" "physical contact" is not required. Id. at *2-3.

_____

officers would often have to act beyond their traditional jurisdiction.").

[9] Aff'd on other grounds by Batiz v. Brown, 676 F. App'x 138 (3d Cir. 2017).

Thus, even relatively subtle physical acts may suffice, depending on the particular situation.[10]

The summary judgment record is unclear on this key element of Plaintiff's false arrest claim. Defendants consistently testified that Plaintiff was invading their personal space and pointing at them. (Mueller Dep. p. 15-16; Saunders Dep. p. 24; see also Gillispie Cert. Ex. A) Plaintiff, however, categorically denies invading the Defendants' personal space and pointing at them. (Walker Dep. p. 63)

Beyond these deposition soundbites however, the record is unclear as to what happened, and when, in those critical minutes between the Defendants entering the foyer and Plaintiff's arrest. While the parties testified as to what they *said* in the moments prior to the arrest, the testimony is vague as to what each person *did*. Moreover, the Court lacks important facts such as the dimensions of the foyer, who stood where, and the amount of space between each person, to place the parties' testimony in context.[11] While it would seem reasonable-- given the parties'

---

[10] For example, in <u>Batiz</u>, the Court held "that Plaintiff's actions-- refusing to move aside from Defendant or take a seat as instructed-- are sufficient physical acts . . . for probable cause" supporting obstruction of justice. 2016 WL 299198 at *4.

[11] Plaintiff's testimony in this regard is difficult to discern. The deposition transcript reads: "Q: What was the closest distance that you got to any of the officers while you were-- before an effort was made to put you in handcuffs? Was it as close as I am to you sitting at this table? A: Probably

portrayal of their interaction leading up to the arrest-- that
Defendants had asked Plaintiff to back away and/or stop pointing
and Plaintiff did not comply (i.e., facts that would support
probable cause to believe that Plaintiff violated 2C:29-1), the
Court cannot find the material facts undisputed at this stage of
the litigation.

As a result, the Court cannot make a ruling on the first
step of the qualified immunity analysis.[12]

Thus, summary judgment must be denied.  See Curley v. Klem,
298 F.3d 271, 278 (3d Cir. 2002) ("a decision on qualified
immunity will be premature when there are unresolved disputes of
historical fact relevant to the immunity analysis."); see also,
Reitz v. County of Bucks, 125 F.3d 139, 147 (3d Cir. 1997).  The
Court will use special jury interrogatories to guide the Court

---

about-- no, maybe a little bit closer because I was in my--
they were standing in front of me and I was like standing maybe
five, five feet.  I don't know.  I'm not exactly sure.  But
maybe I was a little bit closer, like maybe this.  Q:  Like
three feet? A: Yes. That's fair.  Q: So while you were speaking
to them you were at some point five feet and then you moved
closer to three feet and then move back or tell me how it went?
A: I don't think either way.  I don't even think I moved but I'm
not exactly sure of every move that I made but I don't--  I did
not walk towards them pointing my finger and invading their
personal space." (Walker Dep. p. 63-64)

[12] As to the second step, this Court has already held that
the physical act requirement for obstruction of justice under
New Jersey law was clearly established prior to the relevant
time period here.  Batiz, 2016 WL 299198 at *2-3.

in its ultimate determination of Defendants' qualified immunity defense.  See Curley, 298 F.3d at 279.  In the event the jury's answers establish that Plaintiff failed to comply, Defendants will be entitled to qualified immunity.

**B. Excessive Force**

Plaintiff asserts that "Defendants Saunders and Mueller used excessive force in charging at Plaintiff, pushing her against the wall, grabbing her arm, and handcuffing Plaintiff thereby causing bruising to Plaintiff's arms." (Opposition Brief, Dkt. No. 42, p. 10)[13]  Defendants respond that the force used "was so minimal" that a reasonable factfinder could only conclude that the Defendants' actions were objectively reasonable.

The Fourth Amendment permits the use of "reasonable" force. Graham v. Connor, 490 U.S. 386, 396 (1989).  "[E]ach case alleging excessive force must be evaluated under the totality of the circumstances."  Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997).

While it is true that the undisputed record demonstrates that Plaintiff's injuries were relatively minimal, the Third

---

[13] Plaintiff's opposition papers concede that Defendant Heller is entitled to summary judgment as to the excessive force claim.  Accordingly, Defendant Heller's motion in this regard will be granted.

Circuit has stated that "the absence of physical injury" does not "necessarily signif[y] that the force has not been excessive." Sharrar, 128 F.3d at 822. The extent of the resulting injuries from the force used is but one of many factors that must be considered in evaluating reasonableness. See id. In this case, the jury will also be asked to consider:

- the severity of the crime at issue;

- whether Plaintiff posed an immediate threat to the safety of Defendants or others;

- the possibility that Plaintiff was armed;

- the possibility that other persons subject to the police action were violent or dangerous;

- whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight;

- the duration of Defendants' action; [and]

- the number of persons with whom Defendants had to contend.

Third Circuit Model Jury Instruction 4.9 for Section 1983 Excessive Force Claims (March 2017)(citing Graham, 490 U.S. at 396; Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004)).[14]

---

[14] None of these factors require specialized knowledge for which expert testimony would be required. Thus, the Court rejects Defendants' argument that they are entitled to summary judgment because Plaintiff has produced no expert to opine that the force used was excessive. (Moving Brief, Dkt. No. 41-1, p. 12-13)

At summary judgment the Court may not make credibility determinations and must accept Plaintiff's somewhat unlikely version of events. As set forth above, Plaintiff contends she was not physically aggressive in any way with Defendants. Indeed, Plaintiff denies even shouting at Defendants-- notwithstanding her admission that she told Defendants to "get the hell out"-- explaining that she "might talk loud and somebody might interpret that in a different way," (Walker Dep. p. 57, 63)[15], and Hitchens' testimony to the contrary.

Granting all inferences in favor of Plaintiff, if a jury were to credit all of Plaintiff's testimony (and discredit the conflicting testimony), the jury could reasonably find that the force used was unreasonable, and therefore summary judgment on the constitutional question must be denied.[16]

---

[15] To provide full context, Plaintiff testified at her deposition: "Q: Did you raise your voice to the police? A: I don't recall. Q: So there's aspects of what happened in your foyer on July 28th that you don't remember, correct? A: No. . . . That's not correct. Q: So you do remember everything that happened in your foyer on July 28th, correct? A: Yes, I do. Q; But when I just asked you whether you raised your voice you said that's something you do not recall, is that correct, that you do not recall that? A: My raising my voice, somebody – I might talk loudly and somebody might interpret that in a different way. I did not believe I was raising my voice but they may have." (Walker Dep. p. 62-63)

[16] The Court also rejects Defendants' argument that Plaintiff's evidence cannot support a finding that Defendants caused the injuries to Plaintiff's arms. (Moving Brief, Dkt. No. 41-1, p. 14) Again, although Defendants may prevail on this issue at trial, this Court must grant all inferences in favor of

Additionally, the Court holds that Defendants are not entitled to qualified immunity at this stage of the case. The Third Circuit has explained,

> [i]n the context of excessive force claims, we have relied on the factors set forth in <u>Graham</u> and <u>Sharrar</u> in evaluating whether an officer made a reasonable mistake. We have stated that these factors are 'well-recognized,' and that when an officer applies them in 'an unreasonable manner, he is not entitled to qualified immunity.'

<u>Green v. New Jersey State Police</u>, 246 Fed. App'x 158, 162-63 (3d Cir. 2007). Thus, the Court will resolve the issue of qualified immunity by way of special interrogatories to the jury, and, if necessary, Defendants may make an appropriate motion at the appropriate time.[17]

Defendants Saunders' and Mueller's Motion for Summary Judgment on the excessive force claim will be denied.

## C. **Malicious Prosecution**

"To prove malicious prosecution under § 1983, a plaintiff must show that: (1) the defendants initiated a criminal

---

Plaintiff. The undisputed location of the marks and bruises, as well as the temporal proximity between the time of Plaintiff's arrest and the development of the marks and bruises, is sufficient evidence to support an inference that Defendants caused Plaintiff's physical injuries during the arrest.

[17]  To be clear, the Court is not denying Defendants Mueller and Saunders qualified immunity on the excessive force claim. Rather, the Court is simply deferring its qualified immunity decision until the historical facts necessary to the qualified immunity analysis are found by the jury. <u>See</u> <u>Curley</u>, 298 F.3d at 279.

proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009)(en banc).

Defendants argue they are entitled to summary judgment because, as to the last element, the undisputed record shows that Plaintiff suffered no post-arrest deprivation of liberty consistent with the concept of seizure.  Plaintiff argues, without citation to any legal authority, that "Plaintiff's liberty was [] curtailed, constituting a seizure, because she was issued a Disorderly Conduct Summons which required her attendance at court until her case was dismissed at court." (Opposition Brief, Dkt. No. 42, p. 14)  Plaintiff's argument fails.

In order to sustain a malicious prosecution claim, Plaintiff must put forward evidence that, "between arrest and pretrial detention," she was subject to a "seizure *significant enough* to constitute a Fourth Amendment violation." DiBella v. Borough of Beachwood, 407 F.3d 599, 603 (3d Cir. 2005)(emphasis added).  "Being required to post bail, restrictions on travel, and other types of *onerous* non-custodial restrictions may

satisfy the fifth element.  Merely being required to appear at trial, however, is not a sufficient deprivation of liberty to meet this requirement." <u>Wiltz v. Middlesex County Office of Prosecutor</u>, 249 F. App'x 944, 949 (3d Cir. 2007)(emphasis added)(citing <u>Gallo v. City of Philadelphia</u>, 161 F.3d 217, 222 (3d Cir. 1998), and <u>DiBella</u>, 407 F.3d at 603).

In <u>DiBella</u>, the Third Circuit affirmed the district court's vacating of a jury award, holding that "there had been no Fourth Amendment seizure as required in a malicious prosecution action under [] § 1983." 407 F.3d at 600.  In that case, the defendant police officer issued the plaintiffs "a summons for defiant trespass under N.J.S.A. 2C:18-3B, a petty disorderly persons offense."  <u>Id.</u>  The plaintiffs appeared for their municipal court trial and were convicted, but the convictions were later reversed on appeal.  <u>Id.</u>  Afterwards, the plaintiffs filed suit for malicious prosecution.

The Third Circuit explained that the plaintiffs "failed to state a cause of action for malicious prosecution because their attendance at trial did not qualify as a Fourth Amendment seizure." <u>DiBella</u>, 407 F.3d at 603.  The Court further elaborated, plaintiffs "were only issued a summons; they were never arrested; they never posted bail; they were free to travel; and they did not have to report to Pretrial Services." <u>Id.</u>

Applying DiBella's holding to this case, the undisputed record cannot support a malicious prosecution claim. Just like the plaintiffs in DiBella, Plaintiff in this case was merely issued a summons for a disorderly persons offense. She was not required to post bail, or report to Pretrial Services, nor was she subject to any other type of "onerous" pretrial restriction on her liberty. Wiltz, 249 F. App'x at 949; see also, Mantz v. Chain, 239 F. Supp. 2d 486, 503 (D.N.J. 2002)(Brotman, S.D.J.) (in a pre-DiBella case, granting summary judgment on plaintiff's malicious prosecution claim, explaining, "[t]his Court is inclined to agree with those courts which have held, as has the Court of Appeals for the First Circuit, that the issuance of a summons requiring a criminal defendant to appear in court on a specific date does not, by itself, amount to a 'seizure' under the Fourth Amendment."); Fernandez v. Stack, 2006 WL 777033 at *8 (D.N.J. Mar. 27, 2006)(granting summary judgment on a malicious prosecution claim, following DiBella and Mantz).[18]

---

[18] The short period of time that Plaintiff was seated, handcuffed in the back of Defendant Mueller's patrol vehicle (Saunders Dep. p. 32-34), is not a seizure considered in the malicious prosecution analysis because it undisputedly occurred prior to the issuance of the summons. See Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007)("Malicious prosecution differs from false arrest inasmuch as a claim for false arrest, unlike a claim for malicious prosecution, covers damages only for the time of detention until the issuance of process or arraignment, and not more."); Taylor v. Officer Joseph Mazzone, 2016 WL 4272266 at *4 (E.D. Pa. Aug. 12, 2016)("Additionally, Taylor has failed to allege she suffered a deprivation of liberty

Accordingly, Defendants' Motion for Summary Judgment will be granted as to the malicious prosecution claim.

### D. "Fourth Amendment Trespass"

Plaintiff asserts three distinct Fourth Amendment violations. First, she asserts that she never gave Defendant Mueller (as opposed to Defendants Heller and Saunders) permission to enter her house, therefore, Plaintiff claims, Defendant Mueller violated the Fourth Amendment by entering her house. Second, Plaintiff asserts that all three Defendants violated the Fourth Amendment by not leaving the house upon Plaintiff telling them to "get the hell out." Third, Plaintiff asserts that Defendant Mueller violated the Fourth Amendment when he walked around her house to knock on the back door.

### 1. Defendant Mueller's entry into the house

No Fourth Amendment violation occurs when police officers obtain consent to enter a person's home. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990); see also, United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003)("a search conducted pursuant to consent is one of the specifically established exceptions to the warrant requirement."). The issue is whether Plaintiff, through

---

consistent with the concept of seizure as a consequence of a legal proceeding. Taylor alleges she was deprived of liberty by being held in custody before charges were filed against her. Malicious prosecution permits damages for deprivations of liberty imposed pursuant to legal process only.")(citing Johnson).

her actions, implicitly consented to Defendant Mueller's entrance into the foyer of her home. See United States v. Walker, 529 F. App'x 256, 263 (3d Cir. 2013)("Hull argues that he never specifically consented to the officers' search of the purse. That is not determinative. An implied consent to search would be no less valid.").[19] The Court holds yes.

The Court considers the totality of the circumstances to determine implied consent. Walker, 529 F. App'x at 263 (citing United States ex rel. Harris v. Hendricks, 423 F.2d 1096 (3d Cir. 1970)). "[I]if [Plaintiff] said or did something that permitted the officers to form a reasonable belief that [Plaintiff] was authorizing them to [enter her home] then [Plaintiff] may be deemed to have impliedly consented." Id.

It is undisputed that Plaintiff gave Defendants Saunders and Heller permission to enter her home. Plaintiff further testified that "about a minute after [Officers Saunders and Heller] entered my house and shut the door, about a minute later Officer Mueller entered. So at that time all three officers were standing right in the foyer area." (Walker Dep. p. 57)

When Plaintiff allowed Defendants Heller and Saunders into her home, and then did not object when "about a minute later"

---

[19] For this reason, the dispute of fact concerning whether Plaintiff affirmatively invited Defendant Mueller into the house does not preclude summary judgment on this claim.

Defendant Mueller joined them, Defendant Mueller had reasonable grounds to believe that Plaintiff had consented to Defendant Mueller's entrance. Therefore, the Court holds Plaintiff impliedly consented to Defendant Mueller's entry into her home, and no Fourth Amendment violation occurred.

Alternatively, Defendant Mueller is entitled to qualified immunity. A reasonable officer in Defendant Mueller's position could have reasonably believed that Plaintiff impliedly consented to Defendant Mueller's entrance into the house along with the other two officers. The Motion for Summary Judgment will be granted as to this claim.

### 2. **Plaintiff's revocation of consent**

Plaintiff contends that all three Defendants violated her Fourth Amendment rights when they did not leave her house upon her order to get out. This argument somewhat distorts the record insofar as according to Plaintiff's own testimony, all three Defendants could not have been in the house "more than two minutes." (Walker Dep. p. 71-72) Thus, a more accurate framing of the issue is whether Defendants violated Plaintiff's Fourth Amendment rights by not immediately leaving the house-- i.e., overstaying their welcome by a minute, perhaps-- when Plaintiff supposedly told them to get out.

Without deciding the constitutional question, the Court holds that Defendants are entitled to qualified immunity. It

would be not be clear to a reasonable official in the situation he confronted that leaving Plaintiff's house within approximately a minute of her revocation of consent violated the Fourth Amendment.  The Motion for Summary Judgment will be granted as to this claim.

### 3. **Defendant Mueller's walk to the back of the house**

Plaintiff contends that Defendant Mueller violated her Fourth Amendment rights when he "went into the backyard, the curtilage of Plaintiff's home." (Opposition Brief, Dkt. No. 42, p. 16)  According to Plaintiff, this was a "trespass" which violated the Fourth Amendment.  Plaintiff cites no legal authority for this particular argument.

The undisputed record demonstrates that Hitchens lived at the house, the officers knew she lived at the house because they checked her identification, and Hitchens "invited [the officers] onto the property." (Saunders Dep. p. 17, 13)  As already stated, "a search conducted pursuant to consent is one of the specifically established exceptions to the warrant requirement." United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003).  A reasonable factfinder could only find on this record that Hitchens consented to Officer Mueller walking onto the property in an attempt to make contact at the back door.

Officer Mueller's testimony that he "had no permission to go onto the property" when he walked around to the back of the

house (Mueller Dep. p. 7-8) does not preclude summary judgment on this claim.  As set forth above, express verbal permission is not required to establish consent.  <u>See</u> <u>Walker</u>, 529 F. App'x at 263.

The Motion for Summary Judgment will be granted as to this claim.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted in part and denied in part as follows. The Motion will be granted as to the malicious prosecution claim, all "Fourth Amendment trespass" claims, and the excessive force claim against Defendant Heller only.  The Motion will be denied in all other respects.  An appropriate Order shall issue on this date.


Dated: <u>October 24, 2017</u>

                                    __s/ Renée Marie Bumb_____
                                    RENÉE MARIE BUMB
                                    UNITED STATES DISTRICT JUDGE